UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WAULETTA COLEY,                    )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )        No.  4:13CV2454 SPM
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,   )
                                   )
                    Defendant.     )

## MEMORANDUM AND ORDER

Plaintiff Wauletta Coley brings this action pursuant to 42 U.S.C. § 405 seeking judicial review of the Commissioner's final decision denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, it is reversed.

## I.   Procedural History

On September 19, 2009, the Social Security Administration denied plaintiff's July 2009 application for DIB, in which she claimed she became disabled on December 3, 2008, because of a leg fracture and foot drop.  At

plaintiff's request, a hearing was held before an administrative law judge (ALJ) on August 17, 2010, at which plaintiff testified.  The ALJ denied plaintiff's claim for benefits on October 28, 2010, finding the Medical-Vocational Guidelines to direct a conclusion that plaintiff was not disabled given her ability to perform the full range of light work.  (Tr. 86-97.)  Plaintiff thereafter requested the Appeals Council to review the ALJ's decision.  (Tr. 146-49.)

On October 25, 2011, the Appeals Council vacated the ALJ's decision and remanded the matter back to the ALJ for further consideration.  Specifically, the Appeals Council instructed the ALJ to obtain additional evidence concerning plaintiff's impairments, further evaluate plaintiff's mental impairment in accordance with the Regulations, give further consideration to plaintiff's residual functional capacity (RFC) with appropriate rationale and reference to the record, and obtain vocational expert testimony to clarify the extent to which plaintiff's limitations affect the occupational base.  (Tr. 101-06.)

Upon remand, the ALJ held a supplemental hearing on April 23, 2012, at which plaintiff and a vocational expert testified.  (Tr. 48-77.)   On July 5, 2012, the ALJ denied plaintiff's claim for benefits, finding vocational expert testimony to support a finding that plaintiff can perform work as it exists in significant numbers in the national economy.  (Tr. 6-21.)[1]  On October 24, 2013, the Appeals Council

---

[1] In both of her decisions, the ALJ refers to an application for supplemental security income

denied plaintiff's request for review of the ALJ's decision.  The ALJ's decision of July 5, 2012, thus became the final decision of the Commissioner.  42 U.S.C. § 405(g).

In this action for judicial review, plaintiff raises numerous claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Specifically, plaintiff argues that the ALJ erred by failing to indicate what weight she accorded the medical evidence of record and failed to identify the medical evidence supporting her decision that plaintiff was capable of performing light work.  Plaintiff also contends that the ALJ failed to undergo the required analysis in determining her credibility.  Finally, plaintiff argues that because the ALJ's RFC determination is not supported by substantial evidence, the resulting hypothetical question posed to the vocational expert was likewise not supported by substantial evidence and the ALJ thus erred by relying on vocational expert testimony to find her not disabled.  For the reasons that follow, plaintiff's arguments are well taken and the matter will be remanded to the Commissioner for further consideration.

(SSI) that was purportedly filed by plaintiff in November 2009.  (*See* Tr. 9, 89.)  The administrative transcript does not contain such an application or any initial ruling(s) by the Social Security Administration on an SSI application.  In her Brief in Support of the Complaint, plaintiff refers only to her application for DIB.  In view of the record and the nature of plaintiff's claim, the Court considers plaintiff's application for DIB to be the only application before it on judicial review.

## II. Evidence Before the ALJ

Physical Impairment

Plaintiff was involved in an automobile accident on December 3, 2008, and sustained multiple fractures to her right femur. Plaintiff was thirty-one years of age. She underwent internal fixation surgery for placement of pins and rods and was hospitalized through December 10. (Tr. 390-92, 396-97, 417.) Plaintiff returned to the hospital on December 12 after sustaining a fall, but only swelling was noted about the legs. Plaintiff's surgical repair to the right leg remained intact. (Tr. 449-53.)

In February 2009, plaintiff began seeing Dr. William Ricci at Washington University Orthopedics who noted plaintiff to have foot drop as a result of her leg injury. An ankle-foot orthosis (AFO) was provided, and Dr. Ricci instructed plaintiff to begin weight-bearing activities. (Tr. 484.) Through June 2009, Dr. Ricci noted plaintiff to have minimal pain associated with her leg injury, including no significant pain with range of motion exercises. Although plaintiff experienced frustration regarding her foot drop, Dr. Ricci noted that plaintiff was able to engage in full weight bearing activities. (Tr. 486, 488.)

Plaintiff participated in physical therapy at SSM Rehab beginning in June 2009. Plaintiff initially experienced little pain, if any, but reported that ambulating and going up and down stairs exacerbated her pain. Examination showed plaintiff

to have no strength about the tibialis anterior and extensor hallucis longus; significantly decreased strength about the gastroenemius; and mildly decreased strength about the iliopsoas, quadriceps, and gluteus maximus/hamstrings. Plaintiff's goals for therapy included addressing joint range of motion and ambulation, improving her ability to go up and down stairs safely, improving strength, and retraining to do activities of daily living. (Tr. 519-21.)

In July 2009, Dr. Ricci informed plaintiff's employer's insurance carrier that plaintiff could to return to work full duty with no restrictions. (Tr. 512.) Plaintiff's primary care physician, Dr. Christopher M. Perry, likewise informed the insurance carrier that plaintiff was medically cleared to drive. (Tr. 463.)

Upon Dr. Ricci's observation that there was no return of function in relation to plaintiff's foot drop, plaintiff underwent EMG/nerve conduction studies on July 22, 2009, which showed severe right sciatic nerve injury affecting both the peroneal and tibial divisions. Prognosis for further recovery was guarded given the lack of motor units. (Tr. 490-91.) On that same date, plaintiff reported to her physical therapist that her knee and buttock pain had worsened to a level four on a scale of one to ten after she had walked for three hours at a store. (Tr. 527.)

Between July 3 and September 2, 2009, plaintiff participated in physical therapy on fourteen occasions. Although plaintiff initially reported having no pain, she began to consistently complain of worsening knee pain in August with the pain

reported to be at a level three or four.  Plaintiff also reported tingling and intermittent pain in her right foot.  It was noted that plaintiff progressed slowly with physical therapy, but improvement in strength was evident.  (Tr. 523-37.)

On October 20, 2009, plaintiff returned to Dr. Ricci who noted plaintiff to be doing reasonably well and to be full weight bearing with no assistive device. Plaintiff reported that she felt she was getting some strength back in her ankle. Physical examination showed plaintiff to have range of motion about the hip, knee, and ankle without pain and to have minimal dorsiflexion strength of the ankle. Continued foot drop was noted.  Dr. Ricci recommended physical therapy and instructed plaintiff to return in February 2010.  (Tr. 553.)

Plaintiff visited Dr. John Metzler at Washington University Orthopedics on January 6, 2010, and complained of continuing weakness and pain in her right foot, with the pain having increased the previous two months.  Plaintiff reported the pain to range from a level seven to nine on a scale of one to ten.  Plaintiff reported the pain to be most severe when she wears a shoe on the right foot.  Plaintiff was currently taking no pain medication.  Plaintiff expressed concern about her ability to return to work and stated that she would like to return to her job as a bus driver. Physical examination showed full strength bilaterally with hip and knee extension. Limited range of motion was noted about the right knee with flexion as well as with plantar flexion on the right.  Plaintiff was noted to have trace great toe

extension and dorsiflexion on the right.  Mild decreased sensation was noted about the right foot.  Straight leg raising elicited no pain.  Dr. Metzler diagnosed plaintiff with right sciatic nerve injury and history of right midshaft femur fracture, status post open reduction internal fixation.  Dr. Metzler prescribed Neurontin[2] and instructed plaintiff to contact him in two weeks if there was no improvement.  (Tr. 558-60.)

Plaintiff visited Dr. Perry on February 15, 2010, and reported being depressed because of her inability to work due to foot drop.  Plaintiff reported that she stopped going to physical therapy because she did not think it was helping her condition.  Dr. Perry prescribed Celexa[3] and suggested that plaintiff follow up with her orthopedist.  (Tr. 544-45.)

Plaintiff thereafter visited Dr. Ricci on February 23 and complained of continued pain in her leg, and specifically radiating pain from her foot to her knee. Dr. Ricci stated that he could not justify a finding that plaintiff was permanently disabled given her ability to ambulate full weight bearing with no assistive device. Dr. Ricci refilled plaintiff's prescription for Neurontin and suggested that plaintiff obtain another opinion if she thought her pain level prevented her ability to work.

---

[2] Neurontin (Gabapentin) is used to help relieve the pain of postherpetic neuralgia.  *Medline Plus* (last revised July 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

[3] Celexa (Citalopram) is used to treat depression.  *Medline Plus* (last revised Nov. 15, 2014) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html>.

Dr. Ricci recommended that plaintiff see Dr. Susan Mackinnon for further evaluation and management of her nerve injury. (Tr. 563.) However, when plaintiff followed up in May 2010 with complaints of thigh pain and chronic pain radiating from her knee to her foot, Dr. Ricci noted that plaintiff's femur fracture and foot drop were permanent conditions and opined that plaintiff's pain would likely be chronic and permanent. Dr. Ricci opined that such conditions would likely "preclude her from jobs, like her old job of driving a bus since she has a foot drop and cannot adequately control the accelerator. She states that her pain level inhibits her from sitting for long periods of time." Dr. Ricci reported that plaintiff would need the AFO on a permanent basis. Noting that plaintiff had not yet seen Dr. Mackinnon, Dr. Ricci reported that he would work on getting plaintiff in to see her, and that he would see plaintiff on an as-needed basis. (Tr. 566.) In early July 2010, Dr. Ricci prescribed Gabapentin and Tramadol[4] for plaintiff. (Tr. 569-70.)

On July 19, 2010, plaintiff visited Dr. Bakul Dave, a pain specialist at Washington University, and regularly saw him thereafter for her complaints of low back pain radiating down her right leg, foot drop, and chronic nerve pain. At this initial visit in July 2010, Dr. Dave diagnosed plaintiff with chronic pain secondary to traumatic injury of right fractured femur, right foot drop, and chronic

---

[4] Tramadol (Ultram) is a narcotic analgesic used to relieve moderate to moderately severe pain. *Medline Plus* (last revised Oct. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

neuropathic pain of the right lower extremity.  Noting that Neurontin had not helped plaintiff's pain, Dr. Dave prescribed Lyrica.[5]  (Tr. 548-49.)  Beginning in August 2010, however, Dr. Dave prescribed Percocet[6] for plaintiff inasmuch as coverage for Lyrica was denied.  Plaintiff was also instructed to increase her dosage of Trazodone.[7]  (Tr. 550-52.)

Dr. Dave periodically adjusted plaintiff's dosage of Percocet given that the medication provided only partial relief, if any.  In October 2010, Dr. Dave determined that plaintiff could benefit from the surgical implantation of a spinal cord stimulator, and steps were taken to approve the procedure.[8]  (Tr. 573-75, 578, 580, 585-90.)  In late October 2010, Dr. Dave prescribed MSIR (morphine sulfate immediate release),[9] and plaintiff continued on this medication through March 2011.  (Tr. 572, 577, 584.)  During her visit in March, plaintiff reported to Dr. Dave that MSIR did not provide any greater relief than Percocet, and Percocet was

---

[5] Lyrica is used to relieve neuropathic pain. *Medline Plus* (last revised Sept. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html>.

[6] Percocet (oxycodone) is a narcotic analgesic used to relieve moderate to severe pain. *Medline Plus* (last revised Oct. 15, 2014)< http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[7] Trazodone is used to treat depression. *Medline Plus* (last revised Nov. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.  There is no indication in the record as to when Trazodone was prescribed for plaintiff or by whom.

[8] The record shows Medicaid never to have approved the procedure.

[9] Morphine is a narcotic analgesic used to relieve moderate to severe pain. *Medline Plus* (last revised Aug. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html>.

restarted. Plaintiff was also prescribed Cymbalta at this time.[10] Dr. Dave diagnosed plaintiff with right lower extremity causalgia. (Tr. 601-03.)[11] In May, plaintiff continued to report to Dr. Dave that medication did not help her pain. Examination showed increased sensitivity about the right leg. (Tr. 598-600.)

By October 2011, plaintiff was prescribed Fentanyl patches[12] in addition to Percocet in response to Dr. Dave's observation that she was experiencing worsening pain. Plaintiff reported that Fentanyl provided only short term relief. Plaintiff was now diagnosed with causalgia of lower limb, chronic pain, and RSD of the lower limb. (Tr. 607-08.) Plaintiff continued with Fentanyl and Percocet through April 2012, at which time Dr. Dave added Ultram to the medication regimen. During this April visit, Dr. Dave noted that plaintiff had fallen in January and was experiencing pain in her lower back that radiated to the right leg as well as

---

[10] Cymbalta is used to treat depression and generalized anxiety disorder, as well as pain and tingling caused by diabetic neuropathy, fibromyalgia, and ongoing bone or muscle pain. *Medline Plus* (last revised Nov. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

[11] Causalgia, also known as complex regional pain syndrome or reflex sympathetic dystrophy syndrome (RSD), is a chronic pain condition that often affects an arm or a leg and occurs most often after injury. The key symptom of causalgia is intense and burning pain that is much stronger than would be expected for the type of injury; that gets worse over time; and begins at the point of injury but may spread to the whole limb or to the limb on the opposite side of the body. Complex Regional Pain Syndrome, *Medline Plus* (updated Feb. 24, 2014)<http://www.nlm.nih.gov/medlineplus/ency/article/007184.htm>.

[12] Fentanyl (Duragesic) patches are used to relieve severe pain in people who are expected to need pain medication around the clock for a long time and who cannot be treated with other medications. Fentanyl is narcotic analgesic. *Medline Plus* (last revised Aug. 15, 2014)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601202.html>.

pain radiating from the left thigh to the foot. Plaintiff reported that her pain worsened with walking, cold weather, standing, and prolonged sitting but improved somewhat with medication and lying down. Plaintiff's pain was currently at a level ten. Physical examination showed slightly decreased power and reflexes to be 1+. Plantar reflexes were equivocal. Sensation to light touch was normal. Range of motion about the lumbar spine was noted to be decreased in flexion and extension. Dr. Dave noted plaintiff to have some radicular symptoms and positive straight leg raising on the left. Plaintiff was diagnosed with lumbar degenerative disc disease, lumbar radiculopathy, other chronic pain, and RSD of the right lower extremity. A subsequent MRI showed minimal degenerative changes of the lumbar spine. (Tr. 618-22.)

Between July 2010 and April 2012, plaintiff visited Dr. Dave on no less than fourteen occasions and continually reported her pain to be at a level eight through ten and that such pain severely interfered with her sleep, general activity, mood, relations with others, normal work, enjoyment of life, and ability to concentrate. Plaintiff also reported during this period that her pain worsened with cold weather, walking, bending, prolonged sitting, lying down, stress, exercise, and rest but sometimes improved with heat and medication.

The record also contains a letter dated April 18, 2012, from Gerard W. Boehmer, a chiropractor, who wrote that he examined plaintiff on March 28, 2012,

in relation to injuries sustained in an automobile collision of January 16, 2012.  Dr. Boehmer wrote that he diagnosed plaintiff with acceleration/deceleration injury to cervical spine; cervicalgia/neck pain; acute traumatic cervical spine sprain/strain; cervical, thoracic, and lumbosacral muscle spasms; lumbalgia; lumbar sprain/ strain; left leg length discrepancy; right foot paralysis; and hyporeflexia of right foot/leg.  (Tr. 616-17.)  No treatment notes from this March 28 examination appear in the record.

Dr. Boehmer also completed a Physical RFC Questionnaire on April 18, 2012, in which he reported plaintiff to be experiencing right thigh and leg pain at a level ten, and low back and neck pain at a level nine.  Dr. Boehmer reported that plaintiff currently takes oxycodone, Cymbalta, Sertraline, and uses pain patches, and also undergoes chiropractic manipulation with stimulation.  Dr. Boehmer opined that plaintiff's impairments can be expected to last at least twelve months. Dr. Boehmer opined that plaintiff's pain would constantly interfere with the attention and concentration necessary to perform even simple work tasks.  Dr. Boehmer opined that plaintiff could not walk any number of city blocks without rest or severe pain.  Dr. Boehmer further opined that plaintiff could sit and/or stand continuously for five minutes and must lie down after such activity.  Dr. Boehmer opined that plaintiff could sit and/or stand for a total of less than two hours in an eight-hour workday.  Dr. Boehmer opined that plaintiff must be able to walk for

two minutes about every fifteen minutes during the day and could not work an eight-hour workday. Dr. Boehmer reported that plaintiff cannot shift positions. Dr. Boehmer reported that plaintiff would need to take more than ten unscheduled work breaks during an average workday and would need to rest for more than two hours during the day. Dr. Boehmer reported that plaintiff needed to elevate her legs while sitting and needed to use a cane or other assistive device while standing or walking. Dr. Boehmer opined that plaintiff could lift no weight and could never engage in postural activities such as twisting, bending, or crouching. Dr. Boehmer opined that plaintiff could frequently hold her head in a stable position but could only occasionally turn her head to the right or left, look up, and look down. Dr. Boehmer opined that plaintiff had significant limitations with reaching, handling, and fingering and could not engage in any such activities throughout the workday. Dr. Boehmer reported plaintiff to have "all bad" days. (Tr. 611-15.) Dr. Boehmer concluded:

> No tolerance with pain for anything. Becoming depressed with pain cycles and inability of function as described. No recommendation for working until patient improves, which at this point in care is extremely guarded. No sign of improvement for at least 2 years, maybe never. Patient is willing to work when she becomes capable (not in any foreseeable future).

(Tr. 615.)

Mental Impairment

As noted above, Dr. Perry first prescribed Celexa for plaintiff in February

2010 given her reports of feeling depressed because of her inability to work.  (Tr. 544-45.)  In July 2010, Dr. Dave noted plaintiff to be taking Celexa (Citalopram), and plaintiff reported not feeling depressed.  (Tr. 548-49.)

In October 2010, plaintiff underwent a pain psychological evaluation in relation to her possible receipt of a spinal cord stimulator.  Barbara Field, Ph.D., noted plaintiff to be taking oxycodone every five hours for pain.  Plaintiff reported her pain to worsen with walking, lifting, bending, lying down, weather and temperature changes, standing, sitting, stress and worry, heat, ice, and rest and that medication had no effect on the pain.  Plaintiff reported the pain to be located in her right hip to the foot, but also reported having pain in her left leg possibly related to her change in gait.  Dr. Field did not observe any pain behaviors.  Mental status examination was essentially normal.  Plaintiff described her mood as "grumpy," but Dr. Field observed her affect to be euthymic.  Dr. Field noted plaintiff to be taking Celexa for depression as prescribed by her primary physician.  Dr. Field diagnosed plaintiff with depression and assigned a Global Assessment of Functioning score of 68, indicating mild symptoms.  Dr. Field recommended that plaintiff's antidepressant be increased to address her mood symptoms.  Dr. Field further recommended that plaintiff receive additional education about spinal cord stimulation and participate in a ten-week pain management program after receiving the spinal cord stimulator.  (Tr. 592-94.)

Plaintiff visited Dr. Field on November 22, 2010, who noted plaintiff to be tearful and depressed. Plaintiff reported that she was denied disability benefits and was having financial difficulties. Plaintiff reported that she cries much of the day and often cannot sleep because of worry. Plaintiff reported sometimes not wanting to live but denied any intent to harm herself. Plaintiff reported spending most of the day in bed with little motivation to do anything. A plan was established, including plaintiff calling her primary care physician for an increase in Citalopram. Plaintiff was instructed to return in one week. (Tr. 595.)

On December 16, 2010, plaintiff visited Dr. Field who noted plaintiff to be predominantly euthymic. Plaintiff reported having had positive experiences and an improved mood. Plaintiff reported her primary physician not to have increased her Celexa but instead to recommend inpatient treatment in a psychiatry unit, which she did not do. Plaintiff reported that she went to church more often, which was helpful. Plaintiff reported continued feelings of depression and having some suicidal thoughts but no intent. Plaintiff reported that she is able to fall asleep with Trazodone but is awakened by pain and worry. It was noted that plaintiff did not go out with friends to socialize but that they call or come visit her. Plaintiff was noted to rarely get out of the house. Plaintiff agreed to contact her primary care physician again about increasing her Citalopram. (Tr. 596.)

Plaintiff returned to Dr. Field on January 4, 2011, and reported having

- 15 -

socialized with friends and family over the holidays, including going out to eat, to a movie, and to the market. Dr. Field noted plaintiff to have a brighter affect and a much improved mood. Plaintiff reported her primary care physician not to have yet increased her antidepressant. It was noted that a request for a spinal cord stimulator was denied again, and plaintiff expressed disappointment and frustration with that circumstance. Plaintiff reported the possibility of returning to school. (Tr. 597.)

Vocational Rehabilitation

The record shows that plaintiff visited the Missouri Office of Vocational Rehabilitation in February and November 2011. In February, plaintiff reported that she needed sedentary employment and would like to work in an office setting. Plaintiff reported her medical history to include multiple femur fractures with surgery, constant pain in the femur area, foot drop, and depression. Plaintiff reported that she is unable to stand, sit, or walk for long periods of time and that, although sitting is the best of the three, her lower extremity becomes numb. Plaintiff also reported that depression affects her concentration, memory, and energy. Plaintiff was given information regarding vocational services. (Tr. 273.)

In November, plaintiff reported to vocational rehabilitation that constant pain prevents her from walking or standing for long periods of time. Plaintiff also reported her leg to quickly tire. Plaintiff reported that she wanted to work but was

physically unable to do so at the present time.  It was noted that plaintiff's

insurance provider continued to recommend medication therapy instead of surgery

for a spinal cord stimulator, and plaintiff was hopeful that the surgery would be

approved if she was awarded disability benefits.  Plaintiff indicated that she would

continue to work on her typing skills for possible clerical work.  (Tr. 274.)

Testimonial Evidence

*Hearing Held August 17, 2010*

At the hearing on August 17, 2010, plaintiff testified in response to

questions posed by the ALJ and counsel.  Plaintiff was thirty-three years of age at

the time of the hearing.  Plaintiff lived in an apartment with her three children, ages

seventeen years, twelve years, and twenty months.  Plaintiff testified that she had

her general equivalency diploma (GED) and received additional training in home

health care and as a bus driver.  Plaintiff also testified that she received Medicaid

assistance.  (Tr. 29, 37.)

Plaintiff testified that after the accident in December 2008, she experienced

swelling in her leg for about eight months and was on bed rest.  Plaintiff testified

that she also experienced pain and could not walk or do anything during this time.

Plaintiff testified that her doctor arranged for rehabilitation to strengthen her leg

but that the program did not work.  (Tr. 32-34.)

Plaintiff testified that nerve damage from her leg injury causes foot drop and

that her foot "just hang[s] there." Plaintiff testified that she experiences serious pain from her foot up to her right buttock and that her doctors have suggested that the nerve might be trying to come back. Plaintiff testified that the pain has worsened. Plaintiff wears a brace on her right leg and uses a four-pronged cane to help her walk. Plaintiff testified that she also has problems with her left leg because of overuse. (Tr. 34-36.) Plaintiff testified she currently takes hydrocodone, Tramadol, and Trazodone for the pain but that the medication does not help. Plaintiff testified that Lyrica was also prescribed but not approved by Medicaid, and that her pain management specialist suggested that she have a pain pump implanted. (Tr. 36-37.)

Plaintiff testified that she is in constant pain and that the pain is currently at a level eight on a scale of one to ten. Plaintiff testified that she was referred to the pain specialist because of worsening pain. (Tr. 38-39.) Plaintiff testified that there has never been a period during which she experienced improvement in her pain. (Tr. 41.)

Plaintiff testified that she also takes prescribed medication for depression, which stems from her pain and her inability to work and care for her children. (Tr. 43-44.)

As to her exertional abilities, plaintiff testified that she can stand for about thirty minutes before her legs become weak. Plaintiff can walk for fifteen to

twenty minutes.  Plaintiff testified that she can sit for about thirty minutes before her feet become numb.  Plaintiff can lift her child who weighs about thirty pounds, but she cannot walk while carrying her.  (Tr. 44-45.)

Plaintiff testified that her seventeen-year-old daughter helps with household chores such as cooking and laundry, and everyone pitches in to help.  Plaintiff testified that she sometimes vacuums but her children do most of the work because she tires easily and because of the pain in her leg.  Plaintiff testified that the pain interferes with her sleep and her ability to concentrate.  (Tr. 42.)  Plaintiff no longer attends her children's school activities.  (Tr. 46.)

*Hearing Held April 23, 2012*

At the hearing on April 23, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.  At the time of the hearing, plaintiff lived in a house with her three children and her mother.  Plaintiff was taking classes to obtain her GED but had to take a break because of a recent fall.  (Tr. 51-52.)  Plaintiff testified that she has fallen three times since the accident.  Plaintiff continued to wear a brace on her right leg.  (Tr. 58.)  Plaintiff currently weighed 237 pounds, which was eighteen pounds more than before the accident.  (Tr. 63.)

Plaintiff's Work History Report shows that plaintiff worked as a dietary aide in 1995, 1996, and 2000.  Plaintiff worked in a hair salon for one month in 2001. (Tr. 276.)  Plaintiff testified that, prior to the accident, she also cleaned houses,

worked in the deli at Schnucks Market, was a cashier at Wal-Mart, was a bus driver for Riverview Gardens School District, and worked as a home healthcare provider.  (Tr. 67, 70-72.)  Plaintiff's attempt at vocational rehabilitation after the accident was unsuccessful because of pain, depression, and the effects of her medication.  (Tr. 54.)

Plaintiff testified that she has severe stabbing, throbbing, and aching pain from her back to her foot.  Plaintiff testified that walking, standing, and moving around aggravate her pain.  Plaintiff can stand ten to thirty-five minutes and can walk about ten minutes.  Plaintiff experiences pain in the thigh area if she sits too long.  (Tr. 62-63, 65.)

Plaintiff testified that her doctors have recommended additional surgery to place a stimulator in her back but that Medicaid will not pay for it.  (Tr. 59.) Plaintiff testified that she has also been prescribed pain patches but that the pharmacy usually does not have them in stock.  Plaintiff further testified that, regardless, there is no change in her pain when she has the patch.  Plaintiff testified that nothing helps her pain despite being treated by the pain clinic at Washington University with medication and being referred to a neurologist.  (Tr. 60-62.)

As to her daily activities, plaintiff testified that pain affects her ability to do housework, cook, and go to church.  Plaintiff gets a lot of help from her children and her mother.  Plaintiff's older children, mother, and father also help care for her

three-year-old child.  Plaintiff testified that her ability to focus and engage in daily activities is also affected by her depression.  Plaintiff testified that she lies down a lot during the day because she is depressed and because she tires easily and her legs become weak.  (Tr. 62, 64-66.)

Delores Gonzales, a vocational expert, also testified at the hearing on April 23, 2012.  Ms. Gonzales classified plaintiff's past work as a school bus driver and home health aide as medium and semi-skilled; as a day worker as medium and unskilled; and as a retail cashier as light and semi-skilled.  (Tr. 72.)

The ALJ asked Ms. Gonzales to assume that plaintiff was limited to light, unskilled work, to which Ms. Gonzales testified that plaintiff could not perform any of her past relevant work.  Ms. Gonzales testified that she could perform other work, however, such as housekeeping cleaner, of which 9,406 such jobs exist in the State of Missouri and 218,560 nationally; small products assembler, of which 607 such jobs exist in the State of Missouri and 20,191 nationally; and hand presser, of which 756 such jobs exist in the State of Missouri and 48,092 nationally.  (Tr. 73.)

Counsel asked Ms. Gonzales to assume an individual whose pain would occasionally interfere with productivity, to which Ms. Gonzales testified that such circumstance would preclude the performance of the jobs to which she previously testified.  Ms. Gonzales also testified that accommodations would be required for a

person who needed to take rest breaks in addition to those ordinarily provided by an employer.  (Tr. 74-75.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.  The ALJ found that plaintiff had not engaged in substantial gainful activity since December 3, 2008, the alleged onset date of disability.  The ALJ found plaintiff's previous right femur fracture with related chronic nerve pain, right foot drop, chronic neuropathic pain, and causalgia of the right lower extremity to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 12-13.)[13]  The ALJ found that plaintiff had the RFC to occasionally lift and carry up to twenty pounds and ten pounds frequently, stand or walk six hours out of an eight-hour workday, sit six hours out of an eight-hour workday, and was limited to unskilled work because of depression and physical pain.  (Tr. 14.)  The ALJ determined plaintiff unable to perform any of her past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other

---

[13] The ALJ appeared to find plaintiff's obesity, minimal degenerative changes of the lumbar spine, and depression not to be severe impairments.  (Tr. 12.)

work as it exists in significant numbers in the national economy, and specifically, housekeeper, small products assembler, and hand presser. The ALJ therefore found that plaintiff was not under a disability from December 3, 2008, through the date of the decision. (Tr. 19-21.)

## V. Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the

claimant is engaged in substantial gainful activity.  If the claimant is working,
disability benefits are denied.  Next, the Commissioner decides whether the
claimant has a "severe" impairment or combination of impairments, meaning that
which significantly limits her ability to do basic work activities.  If the claimant's
impairment(s) is not severe, then she is not disabled.  The Commissioner then
determines whether claimant's impairment(s) meets or equals one of the
impairments listed in 20 C.F.R., Part 4, Subpart P, Appendix 1.  If claimant's
impairment(s) is equivalent to one of the listed impairments, she is conclusively
disabled.  At the fourth step, the Commissioner establishes whether the claimant
can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the
Commissioner evaluates various factors to determine whether the claimant is
capable of performing any other work in the economy.  If not, the claimant is
declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by
substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v.
Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir.
2002).  Substantial evidence is less than a preponderance but enough that a
reasonable person would find it adequate to support the conclusion.  *Johnson v.
Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"
however, is "more than a mere search of the record for evidence supporting the

Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the

Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The decision may not be reversed merely because substantial evidence could also support a contrary outcome. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

Plaintiff challenges the manner and method by which the ALJ determined her RFC, arguing that the ALJ failed to weigh the medical evidence of record and failed to cite sufficient medical evidence to support her RFC findings. Plaintiff also claims that the ALJ erred in her analysis finding plaintiff's subjective complaints not to be credible. Plaintiff also contends that the ALJ erred by relying on vocational expert testimony to find plaintiff not disabled inasmuch as the hypothetical question posed to the expert was based on an RFC determination that was not supported by substantial evidence. Because the ALJ's final decision is not supported by substantial evidence on the record as a whole, the matter will be remanded for further proceedings.

Credibility

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration,

frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). An ALJ must do more than merely invoke *Polaski* to insure "safe passage for his or her decision through the course of appellate review." *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995). Instead, when making credibility determinations, "the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski*[.]" *Cline*, 939 F.2d at 565; *see also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998). It is not enough to merely state that inconsistencies are said to exist. *Cline*, 939 F.2d at 565.

A review of the ALJ's credibility determination here shows the ALJ to have merely invoked *Polaski* without giving any meaningful consideration to the *Polaski* factors. The ALJ instead discredited plaintiff's subjective complaints of pain by relying only on objective medical evidence from Dr. Ricci's records in 2009 and early 2010 that reported plaintiff to have minimal pain, to be full weight bearing, and to have adequate range of motion; and on x-rays showing that

- 27 -

plaintiff's internal fixation surgery had healed. An ALJ may not discredit a claimant's subjective complaints, however, solely because they are unsupported by objective medical evidence. *Renstrom*, 680 F.3d at 1066; *Polaski,* 739 F.2d at 1322. Indeed, "objective evidence is not needed to support subjective evidence of pain." *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984).

Despite there being substantial evidence of record from which plaintiff's subjective complaints of pain could be properly considered under *Polaski*, the ALJ's decision is devoid of such consideration. The ALJ gave no consideration, for instance, to the substantial evidence showing the increasing duration, frequency, and intensity of plaintiff's pain as demonstrated by her need for significant pain medication – which itself increased in intensity and dosage given its failure to provide relief. With respect to this need for medication, the record shows that, beginning in July 2010 and continuing thereafter, narcotic analgesic medications – including morphine – were prescribed for moderate to severe pain, and such medications were continually adjusted and/or changed because of inadequate relief. By October 2011, plaintiff was being prescribed Fentanyl, a narcotic pain medication used for around the clock relief of severe pain. In April 2012, plaintiff's pain specialist prescribed Fentanyl, oxycodone, and Ultram – three narcotic medications – for plaintiff's pain. In addition, the record shows plaintiff's pain specialist to have continually sought approval for plaintiff to

undergo surgery to implant a spinal cord stimulator.  Such surgery did not occur only because Medicaid denied coverage.

Given the nature and strength of the pain modalities prescribed by plaintiff's pain specialist over a period of years for her continued diagnosed condition of causalgia and chronic pain, it cannot be said that plaintiff's allegations of severe pain are not credible.  *See O'Donnell v. Barnhart*, 318 F.3d 811, 817-18 (8th Cir. 2003).  A "'consistent diagnosis of chronic . . . pain, coupled with a long history of pain management and drug therapy,' [is] an 'objective medical fact' supporting a claimant's allegations of disabling pain."  *Id.* at 817 (quoting *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998)).[14]

Given the ALJ's failure to consider the *Polaski* factors in her analysis of plaintiff's subjective complaints, it cannot be said that her credibility determination is supported by substantial evidence.  *See Cline,* 939 F.2d at 569.  *Cf. Howe v. Astrue*, 499 F.3d 835, 841 (8th Cir. 2007) (credibility determination will be affirmed if ALJ seriously considered, but for good reasons explicitly discredited, a claimant's testimony of disabling pain); *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992).  Because the ALJ failed to consider plaintiff's subjective complaints of pain under the standards set out in *Polaski*, this matter will be

---

[14] Notably missing from the ALJ's summary of Dr. Ricci's findings is Dr. Ricci's May 2010 statement that plaintiff's pain was likely "chronic and permanent."  (Tr. 566.)

remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski*.

Opinion Evidence

Upon concluding that plaintiff's subjective complaints were not credible, the ALJ turned to the April 2012 RFC Questionnaire completed by plaintiff's chiropractor, Dr. Boehmer, and found it not to be "persuasive" in determining disability. (Tr. 19.)

The ALJ first discounted Dr. Boehmer's opinion for the reason that, as a chiropractor, Dr. Boehmer is not an acceptable medical source, thereby making "his opinion . . . not a medical opinion." (Tr. 19.) Although chiropractors are not "acceptable medical sources" under the Regulations and thus cannot provide evidence establishing a medically determinable impairment, *see* 20 C.F.R. § 404.1513(a), they nevertheless are considered to be "other medical sources" who may provide evidence relevant in determining the severity of a claimant's impairment and how it affects the claimant's ability to work. 20 C.F.R. § 404.1513(d). *See also McDade v. Astrue*, 720 F.3d 994, 999 (8th Cir. 2013). As such, while the ALJ could not have relied on evidence from Dr. Boehmer to establish a medically determinable impairment, she nevertheless could have considered it in evaluating the severity of plaintiff's impairments. To discount a chiropractor's opinion merely because of his status as a chiropractor would be

error.

In this case, however, the ALJ provided additional reasons to discount Dr. Boehmer's opinion, namely, because Dr. Boehmer 1) had treated plaintiff on only one occasion prior to rendering his opinion, and 2) provided little explanation for the severity of the opined limitations. (Tr. 19.) Because an ALJ is permitted to discount medical opinion evidence for these reasons, the ALJ did not err in discounting the opinion evidence from Dr. Boehmer, regardless of his status as a chiropractor. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("[T]he longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Plaintiff argues, however, that the ALJ failed to articulate the weight she accorded the other medical evidence of record, and specifically, the treatment records from Drs. Ricci, Dave, and Field. Plaintiff's argument is misplaced. In deciding whether a claimant is disabled, the ALJ considers medical opinions along with the rest of the relevant evidence in the record. *Wagner,* 499 F.3d at 848. The Regulations set forth how the ALJ is to weigh medical opinion evidence, 20 C.F.R. § 404.1527, and specifically require the ALJ to "explain in the decision" the weight given to the opinions of State agency consultants, treating sources, non-

treating sources, and other non-examining sources. 20 C.F.R. § 404.1527(e)(2)(ii).

While an ALJ is required to consider and weigh all relevant evidence of record,

including non-opinion evidence such as treatment records, *see* 20 C.F.R. §§

404.1513(b), 404.1520b, the undersigned is aware of no authority, and plaintiff

cites to none, requiring an ALJ to *explain* in her written decision the weight

accorded to non-opinion evidence of record. As such, the undersigned cannot say

that the ALJ committed reversible error by failing to explain in her written decision

the weight she accorded the non-opinion evidence in this case.

RFC Determination

Residual functional capacity is the most a claimant can do despite her

physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.

2004). The ALJ bears the primary responsibility for assessing a claimant's RFC

based on all relevant, credible evidence in the record, including medical records,

the observations of treating physicians and others, and the claimant's own

description of her symptoms and limitations. *Goff v. Barnhart,* 421 F.3d 785, 793

(8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20

C.F.R. § 404.1545(a). Where, as here, an ALJ errs in her determination to

discredit a claimant's subjective complaints, the resulting RFC assessment is called

into question inasmuch as it does not include all of the claimant's limitations and

restrictions. *See Holmstrom v. Massanari,* 270 F.3d 715, 722 (8th Cir. 2001).

Further, because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC assessment. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). As such, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. *Hutsell*, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Id.*

Here, a review of the ALJ's decision shows the RFC assessment to consist of nothing more than the ALJ's recitation of evidence that served to discredit plaintiff's subjective complaints and the opinion evidence from Dr. Boehmer. (*See* Tr. 14-19.) The ALJ engaged in no discussion or analysis of the evidence – and, indeed, cited *no* evidence – as it related to plaintiff's RFC, that is, what she is able to do despite her impairments. Drawing a conclusion regarding credibility is not equivalent to demonstrating by medical evidence that a claimant has the RFC to perform certain work-related activities. *Estabrook v. Apfel*, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998), *cited approvingly in Graham v. Colvin*, No. 4:12-cv-00863-SPM, 2013 WL 3820613, at *7 (E.D. Mo. July 23, 2013) (memorandum opinion). Instead, the ALJ's RFC assessment must discuss and describe how the

evidence *supports* each conclusion and must cite specific medical facts and non-medical evidence in doing so, as well as resolve any material inconsistencies or ambiguities in the evidence of record. Soc. Sec. Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). The ALJ failed to engage in this process here. In the absence of any thoughtful discussion or analysis by the ALJ, this Court would be required to weigh the evidence in the first instance or review the factual record *de novo* in order to find the ALJ's RFC assessment to be supported by substantial evidence on the record as a whole. This the Court cannot do. *See Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

The ALJ determined plaintiff to have the RFC to lift and carry up to twenty pounds occasionally and ten pounds frequently, stand or walk six hours out of an eight-hour workday, sit six hours out of an eight-hour workday, and be limited to unskilled work. However, the ALJ provided no explanation nor referred to any evidence of record to support this assessment, rendering the decision unclear as to the medical basis, if any, for the ALJ's assessment of the degree to which plaintiff's impairments affect her RFC. *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001); SSR 96-8p, 1996 WL 374184, at *7. Because the ALJ must articulate the medical and other evidence upon which she bases her RFC findings, and she failed to do so here, it cannot be said that the RFC assessment is supported by substantial

evidence on the record as a whole.[15]

Inasmuch as an ALJ's RFC assessment must be based on some medical evidence of the claimant's ability to function in the workplace and must discuss and describe how such evidence supports each RFC conclusion, the ALJ is encouraged upon remand to contact plaintiff's treating physician(s) for a functional assessment as to how plaintiff's impairments affect her ability to engage in specific work-related activities. *See Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002); *see also Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006) (ALJ should recontact treating physician when information provided by physician is inadequate for the ALJ to determine whether the claimant is disabled). The ALJ is also permitted to order medical examinations and tests in order for her to make an informed decision as to disability. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. § 404.1517.

Accordingly, the ALJ upon remand shall obtain additional medical evidence that addresses the extent to which plaintiff's impairments, both severe and non-severe, affect her ability to function in the workplace. Upon receipt of such evidence, the ALJ shall reconsider the record as a whole, including the medical and non-medical evidence of record as well as the credibility of plaintiff's own

---

[15] Given this faulty RFC determination, the hypothetical question posed to the vocational expert based upon this RFC was likewise flawed. *Lauer*, 245 F.3d at 706.

description of her symptoms and limitations, and reassess plaintiff's RFC.  Such reassessed RFC shall be based on some medical evidence in the record and shall be accompanied by a discussion and description of how the evidence supports each RFC conclusion.  *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); SSR 96-8p, 1996 WL 374184, at *7.

Therefore, for the reasons stated above on the claims raised by plaintiff on this appeal,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE


Dated this <u>13th</u> day of <u>March</u>, 2015.